THE JESUS CENTER v FARMINGTON HILLS ZONING BOARD OF APPEALS

Docket No. 163536. Submitted October 17, 1995, at Detroit. Decided January 12, 1996, at 9:25 A.M.

The Jesus Center, a church located in an area zoned for single-family housing in the City of Farmington Hills, filed in the Oakland Circuit Court a petition for review of a denial by the Farmington Hills Zoning Board of Appeals of the petitioner's request to operate a homeless shelter at the church. Under city ordinance, churches and other facilities normally incidental thereto are permitted in single-family residential districts. Also permitted under ordinance are accessory uses customarily incident to the principal permitted use. The board disapproved use of the church as a homeless shelter, concluding that such use is not an accessory use customarily incident to the principal permitted use. The court, Denise Langford-Morris, J., reversed the board's decision, determining that the provision of shelter to the homeless was a permissible accessory use of the church under the ordinance and that the board could not prohibit The Jesus Center from engaging in the religious activity of housing the homeless. The court remanded the matter to the City of Farmington Hills for the development of guidelines for the operation of the homeless shelter at the church. The Farmington Hills Zoning Board of Appeals appealed.

The Court of Appeals *held*:

The Religious Freedom Restoration Act, 42 USC 2000bb *et seq.*, provides that government shall not substantially burden the exercise of religion even if the burden results from a rule of general applicability, except where it demonstrates that application of the burden is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that compelling governmental interest.

The prohibition by the Farmington Hills Zoning Board of Appeals of a homeless shelter at The Jesus Center violated the Religious Freedom Restoration Act. The church's provision of

REFERENCES

Am Jur 2d, Constitutional Law § 466-468.
See ALR Index under Religion and Religious Societies.

shelter to the homeless is an exercise of religion, and the board substantially burdened this exercise of religion by prohibiting the shelter. Assuming, without deciding, that the health and safety concerns raised by some of the residents in the neighborhood are compelling governmental interests, the outright prohibition of the shelter was not the least restrictive means of furthering those interests.

Affirmed.

CONSTITUTIONAL LAW — CHURCHES — HOMELESS SHELTERS — RELIGIOUS FREEDOM RESTORATION ACT.

The use of a church as a homeless shelter constitutes an exercise of religion that, under the Religious Freedom Restoration Act, may not be substantially burdened by government, except where the application of a burden is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that interest (42 USC 2000bb *et seq.*).

*Dykema Gossett* (by *Margaret A. Costello* and *Jeffrey S. Jones*), for the petitioner.

*Kohl, Secrest, Wardle, Lynch, Clark and Hampton* (by *John M. Donohue* and *Derk W. Beckerleg*), for the respondent.

Before: BANDSTRA, P.J., and CAVANAGH and H. A. BEACH,* JJ.

BANDSTRA, P.J. This case presents an important question of first impression for Michigan's communities and churches: To what extent may a local government, through its zoning authority, limit a church from undertaking, in the name of religion, activities that have a negative effect on the church's neighbors?

Since 1984, petitioner, The Jesus Center, has been renting a two-story building at the corner of Inkster Road and Byron Street in the City of Farmington Hills. The church holds traditional services there, including Sunday morning and eve-

* Circuit judge, sitting on the Court of Appeals by assignment.

ning worship, weekly Bible study, and prayer meetings. For some time, The Jesus Center has also used the location as a collection and distribution point to supply food, clothing, and other essentials to needy persons.

The controversy at issue here began in 1991 when The Jesus Center broadened its ministry to provide a shelter service to poor people, including some who are homeless. When the City of Farmington Hills (the City) learned about the shelter service, The Jesus Center was informed that it would be required to get zoning approval for this use of the property.[1] The Jesus Center submitted an application to respondent, Farmington Hills Zoning Board of Appeals (the Zoning Board), requesting a ruling that the provision of shelter services was a permitted "accessory use" to the principal use of the property as a church.[2]

The building rented by The Jesus Center is located in a district zoned RA-4. Under the Farmington Hills Zoning Ordinance, this and other zones designated RA are generally reserved for single-family residential dwellings; however, "[c]hurches and other facilities normally incidental thereto" are also a permitted use. Farmington Hills Zoning Ordinance (the Ordinance), § 34-53(a)(3). The Ordinance also provides:

[1] In addition, The Jesus Center was informed that a number of fire and building code violations existed on the property. These violations were the subject of litigation that has been settled and is not at issue on appeal. For purposes of this analysis, we assume that The Jesus Center has addressed the fire and building code problems.

[2] In the alternative, The Jesus Center requested that the Zoning Board issue a use variance to allow the operation of the shelter. In light of our decision that the Religious Freedom Restoration Act, 42 USC 2000bb et seq., prevented the Zoning Board from prohibiting the shelter program under the facts of this case, we need not review the Board's decision regarding the variance question.

Sec. 34-52. Principal uses permitted.

In an RA-1A, RA-1B, RA-1, RA-2, RA-3, and RA-4 one-family residential district, no building or land shall be used and no building shall be erected except for one (1) or more of the following specified uses unless otherwise provided in this chapter:

* * *

(4) Accessory buildings and uses customarily incident to any principal use permitted.

The Ordinance defines accessory use as "a use which is clearly incidental to, customarily found in connection with and, unless otherwise specified, located on the same zoning lot as the principal use to which it is related." Section 34-3.

The Jesus Center application was discussed at two public hearings in February and April 1992.[3] The question was hotly debated. People from the largely residential neighborhood surrounding The Jesus Center building testified that they were fearful for their families' safety because occupants of the shelter had approached area residents asking for money, theft had increased since the shelter opened, and people from the shelter were loitering, trespassing on private property, and otherwise engaging in harassing behavior. Others said that persons served by the shelter were alcohol abusers and that persons from the shelter had been seen urinating outside a local party store. Opponents of the application contended that the shelter was in operation all week long, not just on weekends, and also complained that the homeless were being bussed in from other communities.

[3] The Jesus Center application was denied at the first hearing although The Jesus Center was not represented at that hearing because of an alleged notice problem. That decision was reviewed at the April hearing, during which the Zoning Board heard testimony from a number of people, including representatives of The Jesus Center and advocates for the shelter service. Upon appeal, The Jesus Center does not argue that it was unfairly or illegally denied notice of the February meeting.

Proponents of The Jesus Center argued that operation of the shelter was part of its religious mission. They attempted to address community concerns by assuring that the shelter operated only on weekend nights during the winter, that the occupants were referred by the Neighborhood Services Organization, The Salvation Army, and Botsford Hospital, and that the occupants were screened for drugs and alcohol before being accepted. They contended that persons receiving shelter services were closely supervised and not allowed to leave the center to wander into the neighborhood. Instead, The Jesus Center representatives argued that occupants of the shelter were bussed to the Center in the evening and back out of the community the next morning. The Jesus Center representatives presented a petition signed by approximately fifty neighborhood residents supporting the shelter. In addition, neighborhood residents testified in support of the shelter program.

Following this conflicting testimony, the Zoning Board unanimously adopted a motion interpreting the Ordinance as not allowing the provision of shelter services as an "accessory use" to a church:

> MOTION by Kocab, support by Corey, with regard to ZBA Case 04-92-3160, to uphold the interpretation of the Zoning Board of Appeals as to whether the use of this church as a shelter which includes sleeping facilities is an accessory use to the church because I would find that it is not an accessory use for the reasons I have stated (to make it short) I incorporate by reference my comments made at the February 4, 1992 ZBA meeting: In that case I said that I would uphold the interpretation by the ZBA as to whether the use of this church as a shelter which included sleeping facilities were appropriately located in a single family residential area and at that point in time I did not find tat [sic] this was an appropriate accessory use for the

reasons that apparently the sheltering is done on a full time basis and stated then that in addition the proposed use is a non-residential use and is more of a hotel/motel use and I though [sic] about that tonight and I took a look at the preamble to section 34-51(a) which talks about what is a residential use and what the purposes behind it and I'm quoting now verbatim: "The purposes [sic] of a residential district is designed to be the most restrictive of the residential districts. The intent is to provide for an environment of predominantly low-density, one-family detached dwellings along with other residentially related facilities which serve the residents in the district." So when I say I say [sic] this is more akin to a motel or general business use I don't mean to say or suggest that they are charging rent here but what they are doing is violating the spirit of the residential ordinance and you have that turnover too.

The reasons incorporated by reference from the February 4 meeting were contained in a motion that had been unanimously adopted at that earlier meeting:

MOTION by Kocab, support by Corey with regard to ZBA Case 2-92-3146, to uphold an interpretation by the Zoning Board of Appeals as to whether the use of this church as a shelter which includes sleeping facilities is an accessory use to the church or appropriately located within a single family residential area because this use cannot be construed as an accessory use to a church as practiced in Farmington Hills; the board heard testimony from the audience that other churches house the homeless on a periodic basis, however, this request is on a full time basis and this is a totally different request. In addition, the proposed use is not a residential use and is more of a hotel/motel use or a general business use.

The Jesus Center filed in the circuit court a petition for review of the denial of its application.

Following briefing by the parties and oral arguments, the circuit court ruled that The Jesus Center's operation of the shelter service was, as a matter of law, a permissible accessory use of the building as a church. The court issued an order reversing the interpretation of the Ordinance adopted by the Zoning Board. It ordered that the Zoning Board cannot prevent The Jesus Center from "its religious activity of housing the homeless" and remanded the matter to the City of Farmington Hills "for guidelines in the operation of The Jesus Center's program for housing the homeless." The Zoning Board brought this appeal contesting the circuit court's decision and order.

Under MCL 125.585(11)(c); MSA 5.2935(11)(c), a reviewing court must defer to determinations of fact made by a zoning appeals board if those determinations are supported by competent, material, and substantial evidence on the record. *Macenas v Village of Michiana,* 433 Mich 380, 396; 446 NW2d 102 (1989). The circuit court properly noted that it was "not questioning the Board's factual findings" in issuing its opinion and order.[4] In its motions interpreting and applying the "accessory use" provision, quoted *supra,* and related motions denying a use variance,[5] the Zoning Board appar-

---

[4] The court also noted testimony advanced by the proponents of the center that they only house the homeless temporarily on weekends, two nights a week, in the winter months. However, we do not conclude that the court adopted that viewpoint as fact, but merely referred to it as evidence that the center would be willing to work with local authorities to address neighborhood concerns while continuing the shelter program.

[5] Although we are not reviewing the Zoning Board's decision regarding the variance question, see n 2 *supra,* the motions regarding the variance question and the accessory use question were adopted simultaneously, and we consider the factual findings in both to have been a basis for the Board's decision regarding the accessory use question. In pertinent part, the motion regarding the use variance made a number of factual determinations:

ently made factual determinations that the shelter was operating on a full-time basis, not just during winter weekends and that shelter recipients were trespassing upon neighbors' property, urinating in public, and creating a nuisance to the residents of the surrounding area. We find these factual determinations, although debatable considering the conflicting testimony presented to the Zoning Board, to be sufficiently based upon requisite evidence and adopt them for purposes of this appeal. *Id.*

Our review goes beyond determining whether the factual determinations made by the Zoning Board were based on sufficient evidence. In addition, we must decide, as a matter of law, whether the application of the Ordinance, on the basis of these facts, was in violation of a superseding law. *Id.* at 394-396.

The Jesus Center argues that the ordinance, applied to the facts of this case to prohibit it from

MOTION by Kocab, support by Corey, with respect to ZBA Case 04-92-3160, to deny proponent's request for a use variance in order to locate a shelter at this location because the testimony of the surrounding residents is based on personal observation; and for all of the same reasons stated in the motion from the February 4, 1992, hearing, as follows:

[T]he property can be used for the purpose for which it is zoned, that being a church; the proposed use would alter the essential characteristics of the area; granting the request would result in increased trespassing upon the surrounding neighbors and would pose a threat to the public health and welfare, as testified by the neighbors that the persons currently residing illegally at this site, urinate in public and create a nuisance to the surrounding area; and there is no practical difficulty to allow such a use in this area.

\* \* \*

Furthermore, the proponent has not come close to meeting the standards for a use variance; the proponent's testimony that denial of this request would infringe on the proponent's rights and denying [sic] him freedom of religion is false as the proponent can continue his religious freedom; this use is injurious to the public welfare and to the surrounding area; there are alternative locations for a shelter closer to where the homeless come from, such as Cass Corridor.

providing shelter services, is in violation of the Religious Freedom Restoration Act (RFRA), 42 USC 2000bb *et seq.*[6] We agree.

The RFRA was enacted in late 1993 in response to *Employment Division, Dep't of Human Resources of Oregon v Smith,* 494 US 872; 110 S Ct 1595; 108 L Ed 2d 876 (1990), which the statute characterizes as having "virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion." 42 USC 2000bb(a)(4). See, also, *Church of the Lukumi Babalu Aye, Inc v City of Hialeah,* 508 US 520, 531; 113 S Ct 2217; 124 L Ed 2d 472 (1993) ("a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice"). The Congress found that "laws 'neutral' toward religion may burden religious exercise as surely as laws intended to interfere with religious exercise." 42 USC 2000bb(a)(2). The purposes of the RFRA are to "restore the compelling interest test as set forth in *Sherbert v Verner,* 374 US 398 [83 S Ct 1790; 10 L Ed 2d 965] (1963) and *Wisconsin v Yoder,* 406 US 205 [92 S Ct 1526; 32 L Ed 2d 15] (1972)" and "to provide a claim or defense to persons whose religious exercise is substantially

---

[6] The Jesus Center also argues that the Zoning Board decision was in violation of the Free Exercise Clauses of the United States and Michigan Constitutions. However, the availability of this constitutional protection is questionable because the Ordinance might well be considered neutral and of general applicability under *Employment Division, Dep't of Human Resources of Oregon v Smith,* 494 US 872; 110 S Ct 1595; 108 L Ed 2d 876 (1990), and *Church of the Lukumi Babalu Aye, Inc v City of Hialeah,* 508 US 520, 531; 113 S Ct 2217; 124 L Ed 2d 472 (1993). We will not reach these constitutional questions because our decision regarding the RFRA disposes of the issues raised in this appeal. Further, our decision that the RFRA prohibits application of the Ordinance against The Jesus Center makes it unnecessary to consider the argument that the shelter program was an "accessory use" and allowed under the Ordinance.

burdened by government." 42 USC 2000bb(b)(1), (2).

The RFRA applies here because the Zoning Board is a "branch, department, agency, [or] instrumentality . . . of . . . a subdivision of a State." 42 USC 2000bb-2(1). The RFRA applies retroactively to government action taken before its enactment. 42 USC 2000bb-3(a); *Lawson v Dugger,* 844 F Supp 1538, 1542 (SD Fla, 1994).

In pertinent part, the RFRA provides:

> (a) In general
> Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.
> (b) Exception
> Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—
> (1) is in furtherance of a compelling governmental interest; and
> (2) is the least restrictive means of furthering that compelling governmental interest. [42 USC 2000bb-1.]

By its terms, this statute requires that we consider four questions, each the threshold of the next: (1) whether The Jesus Center's free "exercise of religion" was adversely affected by the Zoning Board's action; (2) whether the Zoning Board's action "substantially burdened" The Jesus Center's exercise of religion; (3) whether the Zoning Board's action was "in furtherance of a compelling governmental interest"; and (4) whether the Zoning Board's action was "the least restrictive means of furthering that compelling governmental interest."

Beginning with its application to the Zoning Board, at the Board hearing, and throughout the

court proceedings that followed, The Jesus Center has contended that its provision of shelter services flows from its religious beliefs and is an exercise of those beliefs. We are not at liberty to question this position. "Determining that certain activities are in furtherance of an organization's religious mission . . . is . . . a means by which a religious community defines itself." *Corp of The Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v Amos,* 483 US 327, 342; 107 S Ct 2862; 97 L Ed 2d 273 (1987) (Brennan, J., concurring). It is not the job of the courts to second guess "what activities are sufficiently 'religious' " to qualify for "free exercise" protection. *Cohen v City of Des Plaines,* 8 F3d 484, 490 (CA 7, 1993).[7]

However, we note that The Jesus Center's argument that its shelter program is an expression of its faith is certainly not unique or otherwise difficult to believe. The Bible, which The Jesus Center professes to follow, is replete with passages teaching that the God of the Bible is especially concerned about the poor,[8] that believers must also love the poor,[9] and that this love should result in concrete actions to deal with the needs of the

[7] Both *Amos* and *Cohen* are cases interpreting the Free Exercise Clause of the United States Constitution. However, we find these and other precedents interpreting this constitutional provision helpful in interpreting the RFRA because the purpose of the RFRA was to reinstate the compelling interest test developed under constitutional analysis in cases before *Smith.* 42 USC 2000bb(a)(4), (a)(5), and (b)(1).

[8] See, e.g., Psalm 14:6 ("You evildoers frustrate the plans of the poor, but the LORD is their refuge."); Job 34:19 (God "shows no partiality to princes and does not favor the rich over the poor, for they are all the work of his hands."); I Samuel 2:8 ("He raises the poor from the dust and lifts the needy from the ash heap; he seats them with princes and has them inherit a throne of honor."). New International Version, Grand Rapids: Zondervan Bible Publishers (1978).

[9] See, e.g., I John 3:17 ("If anyone has material possessions and sees his brother in need but has no pity on him, how can the love of God be in him?"); Proverbs 17:5 ("He who mocks the poor shows contempt for their Maker."). See n 8, *supra.*

poor.[10] Many of these biblical provisions, found in the Old Testament, are adhered to by Jews' and Christians alike. In fact, "the concept of acts of charity as an essential part of religious worship is a central tenet of all major religions." *Western Presbyterian Church v Bd of Zoning Adjustment of the Dist of Columbia,* 862 F Supp 538, 544 (D DC, 1994). The specific act of charity at issue here, providing shelter or sanctuary to the needy, has been part of the Christian religious tradition since the days of the Roman Empire. See *Greentree at Murray Hill Condominium v Good Shepherd Episcopal Church,* 146 Misc 2d 500, 504-505; 550 NYS2d 981 (1989). The Zoning Board does not argue that The Jesus Center is providing shelter services for anything but a religious purpose, and we find that the RFRA requirement that The Jesus Center's "exercise of religion" was burdened by the Zoning Board decision is satisfied.

We also conclude that the Zoning Board's decision "substantially burden[ed]" The Jesus Center's exercise of its religious beliefs. In defense of its decision to completely prohibit the shelter service program at The Jesus Center's location, the Zoning Board argues that The Jesus Center should move the program to another location within Farmington Hills or elsewhere. In its motion denying the use variance, the Board concluded that "there are alternative locations for a shelter closer to where the homeless come from, such as Cass Corridor." A similar argument was rejected in *Western Presbyterian Church* where the Court reasoned that "[o]nce the zoning authorities of a city permit the construction of a church in a

---

[10] See, e.g., Proverbs 29:7 ("The righteous care about justice for the poor, but the wicked have no such concern."); Deuteronomy 15:11 ("There will always be poor people in the land. Therefore I command you to be openhanded toward your brothers and toward the poor and needy in your land."). See n 8, *supra.*

particular locality, the city must refrain, absent extraordinary circumstances, from in any way regulating what religious functions the church may conduct." 862 F Supp at 546.[11]

We agree with this analysis. The relocation of the shelter program would certainly create an economic burden for The Jesus Center, requiring the lease or purchase of another facility. Further, in contrast to secular organizations providing shelter services, The Jesus Center's program flows out of and is a witness to the love of God for the poor. By serving the homeless at the same location where The Jesus Center adherents worship their God, this witness is greatly facilitated. The Zoning Board's decision to require The Jesus Center to move its entire operation or relocate its shelter program apart from its worship facility constitutes a substantial burden under the RFRA.

Further, the RFRA is not satisfied because the Ordinance could be interpreted to permit The Jesus Center to operate the shelter program as an accessory use, but only if other churches customarily operated similar programs.[12] Even though the

[11] In contrast, the United States District Court for the Middle District of Florida considered a case where the church had not yet located, but was seeking approval for a shelter program in anticipation of locating. *Daytona Rescue Mission, Inc v City of Daytona Beach,* 885 F Supp 1554, 1556 (MD Fla, 1995). There the court reasoned that it was not a "substantial burden under the RFRA to require the church to initially locate in a zoning district where the shelter program was specifically permitted. The Jesus Center has been at the Inkster Road and Byron Street location since 1984, and the *Western Presbyterian* analysis is more compelling.

[12] This was apparently the Ordinance language on which the Zoning Board relied to deny The Jesus Center application. The February version of the adopted Board motion, quoted *supra,* states as one of its grounds that "this use cannot be construed as an accessory use to a church as practiced in Farmington Hills." As argued in the Zoning Board's brief, "the operation of a permanent shelter for the overnight sleeping of persons is not a use which is customarily found in churches in Farmington Hills or in other communities in the State of Michigan. While aiding the poor and downtrodden may be an under-

Ordinance might not be a total prohibition of the religious activity at issue here, restricting The Jesus Center in this fashion also constitutes a substantial burden under the RFRA. Societal needs change over time and the ways in which churches respond to those needs are "a means by which a religious community defines itself." *Amos, supra.* It is substantially burdensome to limit a church to activities and programs that are commonly practiced by other churches rather than allowing it to follow its faith even in unique and novel ways.

Regarding the "compelling governmental interest" question, the Zoning Board rightly relies upon many precedents[13] holding that churches, like other property, are subject to zoning regulations. As in those precedents, we recognize that zoning regulations are a legitimate means to protect important property interests and accommodate competing uses of property within a community. We assume for purposes of our analysis that the Zoning Board's action was in furtherance of a "compelling governmental interest" under the RFRA.

Nonetheless, we conclude that the Zoning Board did not protect this interest using "the least restrictive means" available. On this issue, we again find guidance in *Western Presbyterian Church,* where the Court noted that "[t]he Church recognizes its responsibility to the community and has represented that it will take all reasonable steps to assure the program will not result in harm to its congregation and neighbors." 862 F Supp 546.

---

taking that some churches pursue in one form or another, the operation of a permanent shelter for the overnight sleeping of several unrelated persons, including homeless persons, is not the customary method most churches employ."

[13] See, e.g., *Roman Catholic Archbishop of Detroit v Village of Orchard Lake,* 333 Mich 389; 53 NW2d 308 (1952); *Islamic Center of Mississippi, Inc v City of Starkville, Mississippi,* 840 F2d 293 (CA 5, 1988).

Similarly, The Jesus Center has exhibited a willingness and an ability to work with city officials as evidenced by the settlement of a related case involving fire and building code violations. With respect to the neighborhood concerns addressed in this case, The Jesus Center has throughout the proceedings been willing to work with city officials to develop guidelines for its operation of the shelter to mitigate community concerns. Under the "least restrictive means" requirement of the RFRA, the City must at least initially[14] attempt to address community concerns in this fashion. *Id.*

The Zoning Board's decision to apply the Ordinance to completely prohibit the shelter service program went too far under RFRA analysis. The circuit court properly reversed that decision and remanded the case to the City so that, working with The Jesus Center, guidelines might be developed to regulate the shelter program.

We affirm.

[14] We are not dealing with a situation where regulatory guidelines were attempted but were unsuccessful in addressing legitimate neighborhood concerns. In such a case, it might be argued that complete prohibition of a shelter program is the "least restrictive means" available, the lesser restriction of regulatory guidelines having failed. We express no opinion regarding that situation or argument, but only hold that the initial government response to the neighborhood concerns in this case could not be the forced closure of the shelter program.